Filed 5/19/23  P. v. Gaytan CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>OSCAR GAYTAN,<br><br>    Defendant and Appellant. | F082042<br><br>(Super. Ct. No. MCR054817)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Joseph A. Soldani, Judge.

Nuttall & Coleman, Roger T. Nuttall; Page Law Firm and Edgar E. Page for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A.Y.[1] lived with defendant Oscar Gaytan (stepfather), her mother, and her younger brother in Madera. A.Y. later alleged defendant sexually abused her from ages six to 12. Subsequently, defendant was found guilty by a jury of two counts of forcible, lewd acts upon A.Y. (Pen. Code, § 288, subd. (b)(1),[2] counts 1 & 2); aggravated sexual assault of A.Y., who was under the age of 14 years, and defendant was seven years or older than A.Y. at the time of the offense (§ 269, subd. (a)(1), count 3); and oral copulation of A.Y., who was under the age of 14 (§ 287, subd. (c)(1), count 4). As to counts 1 and 2, the trial court imposed two consecutive upper terms of 10 years. As to count 4, the trial court imposed a consecutive two-year term (one-third the middle term of six years). As to count 3, the trial court imposed an indeterminate term of 15 years to life. The total aggregate sentence imposed was 37 years to life.

On appeal, defendant makes several claims of prosecutorial misconduct and alleged errors by the trial court. As to prosecutorial misconduct, defendant alleges the prosecutor committed misconduct when he: (1) improperly shifted the burden of proof during defendant's cross-examination by insinuating defendant had no cooperating witnesses and implying he had a duty to produce this evidence, and then subsequently arguing this lack of corroboration during his closing argument; (2) referenced sexual abuse against A.Y.'s aunt during his opening statement before the trial court had made its ruling regarding its admissibility; and (3) questioned defendant about statements made after his Louisiana arrest even though it had not been established the statements were not obtained in violation of his *Miranda*[3] rights.

---

[1] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

[2] All further references are to the Penal Code, unless otherwise stated.

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

As to alleged errors by the trial court, defendant contends the trial court erred when it failed to properly instruct the jury regarding: (1) the sustained objection during his cross-examination; and (2) the Evidence Code section 1108 evidence, specifically alleged abuse against A.Y.'s aunt by defendant mentioned by the prosecutor during his opening statement and the uncharged conduct by defendant in both Texas and Louisiana.

We conclude, that as to each individual claim, the prosecutor's conduct does not rise to prosecutorial misconduct. Further, we conclude the trial court did not err because it properly instructed the jury.[4] Accordingly, we affirm the judgment.

## SUMMARY OF FACTS

*Prosecution Case-in-Chief*

A.Y. was born in 2001 and was 19 at the time of trial. A.Y. knew defendant "[f]or as long as [she could] remember, probably from the age of two" and at first had a normal "father-daughter relationship." In 2009, A.Y.'s mother married defendant and subsequently, defendant, A.Y., A.Y's mother, and A.Y.'s younger brother all moved into a home in Madera. However, after they moved into the home, defendant started inappropriately touching A.Y. Around nine or 10 years old, A.Y. began to think this behavior was unusual.

*1. The Conduct Alleged in Counts 1 and 2*

The first type of conduct occurred when A.Y. was six years old. While A.Y.'s mother was at work and her brother was inside his room, defendant "would start grabbing

---

**4** For the first time in his reply brief, defendant further contends the trial court erred: (1) by denying his motion for a mistrial after the prosecutor improperly shifted the burden of proof during his closing argument when he stated defendant's testimony was "uncorroborated;" and (2) by failing to *immediately* instruct the jury after concluding the alleged acts against A.Y's aunt were inadmissible. These arguments are forfeited because defendant did not raise them in his opening brief. (*People v. Baniqued* (2000) 85 Cal.App.4th 13, 29 ["[A] point raised for the first time [in their reply brief] therein is deemed waived and will not be considered, unless good reason is shown for failure to present it before ... [n]o good cause is shown here"].)"

[A.Y.] or holding onto [her], putting [her] on his lap directly on top of his crotch and holding [her] down to sit there." He would "call [her] over to watch a movie or to just sit down with him … anything just to get [her] near him, and he would usually have [her] sit on his lap" while his penis was erect. A.Y. would try to get away and say, "I need to clean my room; it's still not done" and defendant would respond, " 'You can do it later. It's okay. It's just really quick,' and hold [her] down so [she] wouldn't be able to get up." This type of behavior occurred "[m]ore than 50 times. It was consistent."

During one specific instance, when A.Y. was 11 years old, she was in the living room watching her favorite children's movie when defendant had her sit on his lap. She could feel defendant's erect penis against her vagina. A.Y. was "facing away from [defendant] looking at the TV" while only wearing "[her] undergarments, a shirt, and some pants" and defendant was only wearing "undergarments and shorts." Defendant told her, "[T]his is only to help prepare you for later on in life, so no other person can hurt you if you know what's right and what's wrong."

2. *The Conduct Alleged in Count 3*

The second type of conduct occurred when A.Y. was 12 years old. During one specific instance, defendant picked A.Y. up from school and gave her a water bottle to drink. They went to the house where "no one was home." A.Y. "started to feel dizzy"[5] and "couldn't hold [her]self up." Defendant then told A.Y. to go to the master bedroom and lay down where he proceeded to take off her underwear and shirt. Defendant then removed his clothing and told her "not to worry because everything was going to be okay; he was just helping [her] to learn." He then forced A.Y. to stay down and "had [her] hands down at the top of [her] head with one of his hands, and [she] couldn't move." He then had intercourse with her. A.Y. told defendant to stop, but he "kept telling [her], 'It's okay. This is going to help you, like, if you know what's right and

---

**5**      A.Y. later testified that at the age of 12 defendant gave her pills "every other day."

what's wrong when you're with someone else.' " After defendant stopped, he took A.Y. to her room and A.Y's brother asked defendant where she was at and he replied, "Don't worry; she's asleep." Once A.Y. awakened, she told her mother that defendant had picked her up and her mother replied, "It's okay. I know."

During a second incident, when A.Y. was 12 years old, defendant picked her up from her mother's work and took her home, where they both were alone. At home, defendant "pulled [A.Y.] into [her] bedroom" and "undressed [her] and he told [her] that everything was going to be okay, that nothing bad was going to happen, but [she] told him [she] didn't want to do it." Defendant responded, " 'Well, if you don't continue, I will no longer have you as my favorite,' and that [A.Y.'s] brother would become his favorite." A.Y. then "allowed [defendant] to hurt [her] or to have intercourse with [her]." He was facing her, "bounded [her] hands again at the top of [her] head, and he put his penis into [her] vagina."[6]

### 3. The Conduct Alleged in Count 4

The third type of conduct occurred when A.Y. was 12 years old. During one specific incident, while defendant and A.Y. were alone in her bedroom, he pulled A.Y.'s pants and underwear off and orally copulated her. A.Y. tried moving, but defendant's knees were on top of her pants, which was around her ankles.

### 4. Additional Uncharged Conduct

The family moved to Texas during A.Y.'s eighth grade year because defendant and her mother were offered a job at a warehouse. During one specific incident, defendant got into bed with A.Y. and started "rubbing his penis along [her] back." While in Texas, A.Y. and defendant had intercourse "[a]t least 15 times."

---

**6** During cross-examination, A.Y. testified that during some of these incidents defendant placed duct tape over her mouth and tied up her legs and hands with yellow rope.

The family then moved to a hotel in Louisiana when A.Y. "was 14, about to be 15." During one specific instance, defendant "walk[ed] [her] to [the] hotel room" and "he pushed [her] facedown onto the bed, … pull[ed] down [her] pants and [her] underwear, and he had his hand on [her] back pushing [her] down." He then had intercourse with her. A.Y. told defendant "that [she] didn't want to ... [and] started crying." Subsequently, A.Y. wrote a suicide letter where she told her mother she was sorry "for putting her through the pain that she was about to go through." Defendant found the letter and "ended up beating [A.Y.]" and told her that "if [she] were to say anything else, that he would leave [her] in a ditch and nobody would find [her]."

During this period of abuse, defendant would often talk with A.Y. about sex and "show [her] articles on his phone, how stepdads and their daughters would have intercourse, and he would explain to [her] that it's completely normal." Further, while defendant was with A.Y. he would watch "movies [with] sex scenes or dirty dancing – female on male." Defendant would tell A.Y. "that if [she] were to have told anyone, that he could go away for a very long time, that [she] would hurt [her] mother and [she] would ruin her marriage with him, and he would threaten to hurt [her] brother if [she] were to say anything."

5. *Subsequent Law Enforcement Investigation*

A.Y. was 15 years old when she disclosed to her grandparents that defendant "was raping [her]." In June 2016, Madera Police Department (MPD) Detective A. Keiser[7] was

---

[7]     Detective Keiser had her last name changed to "Videgain," but was referred to as Keiser throughout the entirety of the trial.

6.

assigned to investigate this case.  She met with A.Y. and proceeded to conduct a pretext phone call with defendant.**8**  The relevant portions of the phone call are as follows:**9**

> "[A.Y.]:  Hello.
>
> "[DEFENDANT]:  Hello.  What happened?
>
> "[A.Y.]:  Hi dad.
>
> "[DEFENDANT]:  Hello.  [¶] … [¶]
>
> "[A.Y]:  I've been thinking about what had happened in Louisiana.
>
> "[DEFENDANT]:  What?
>
> "[A.Y.]:  With us.  [¶] … [¶]
>
> "[A.Y.]:  In the hotel room.
>
> "[DEFENDANT]:  Uh-Huh.  What happened?
>
> "[A.Y.]:  When we had sex.
>
> "[DEFENDANT]:  Okay.  Where you at? What happened?  [¶] ... [¶]
>
> "[A.Y.]:  I was – well I'm afraid that it's going to hurt [my mother] 'cause you never know if she will find out.
>
> "[DEFENDANT]:  Does she know anything?
>
> "[A.Y.]:  I don't know if she knows but she can probably find out.  [¶] … [¶]
>
> "[DEFENDANT]:  Why?  You told somebody?

---

**8**  Detective Keiser testified a pretext phone call is a call "with a person who has some type of relationship to the suspect in the investigation" and "it's a ruse of something that they can speak to the person being investigated to get them to talk about what happened, like the alleged acts that occurred to show that – to corroborate what the person is alleging."

**9**  For clarity purposes, we have removed the portion of the transcript where Detective Keiser is telling A.Y. what to say over the phone.

"[A.Y.]:          No.

"[DEFENDANT]:    What happened?  Why – I don't know why – why on telephone?  Why are you talking about? [¶] … [¶]

"[A.Y.]:          It's just been bothering me.

"[DEFENDANT]:    Huh? [¶] … [¶]

"[A.Y.]:          You know that I'm afraid of getting pregnant.  You know that – that I didn't want that.  Remember one time in Texas?

"[DEFENDANT]:    Ah, no.  Yeah.  When, uh, n-n-.  That is not possible. [¶] … [¶]

"[A.Y.]:          It is possible.

"[DEFENDANT]:    Um.  I don't know.  Because you have your thing – the things.  (Unintelligible).  I don't know – I don't know – I don't know. [¶] … [¶]

"[A.Y.]:          I haven't started it though.

"[DEFENDANT]:    Huh?

"[A.Y.]:          I haven't started it. [¶] … [¶]

"[DEFENDANT]:    I don't know what you talking about.  I mean, think I am confused. [¶] … [¶]

"[A.Y.]:          I haven't started it dad.  I'm afraid that I am pregnant.

"[DEFENDANT]:    I'm not, um, I'm not – you are not pregnant.  Uh, I don't know, I mean, I don't know (unintelligible).  I don't know ….  You could have that (unintelligible). [¶] … [¶]

"[A.Y.]:          I didn't have it later on.

"[DEFENDANT]:    You've been having your period th-I – I don't know.  Wh-wh-why you making this right now?  Why – why – I don't know.  Wh-why-why-why you can't get pregnant.  I – I don't know what you talking about, I mean …

8.

| | |
|---|---|
| "[A.Y.]: | Well you know that ... |
| "[DEFENDANT]: | I mean I kinda – I'm kind of confused. I'm kind of confused. I'm kinda – I don't know babe. Everything that happened – I don't know. My – my head is racing right now. I don't know, um, just wanna – I don't know. [¶] ... [¶] |
| "[A.Y.]: | Mom if she asked me – if she asked me if we had sex. What should I tell her? |
| "[DEFENDANT]: | Why you call me? Why is everything you call me for that? Why you say now – why – why – I think I'm okay though. Why – I don't know. |
| "[A.Y.]: | What should I tell [my mother] if she asks me if we had sex? |
| "[DEFENDANT]: | Why – why you making up right now? |
| "[A.Y.]: | Wh-what if [my mother] asks me if we did have sex? |
| "[DEFENDANT]: | Um, what? [¶] ... [¶] |
| "[DEFENDANT]: | We haven't. How did – how did she know? How did you, uh, how did you – why is she gonna ask that? [¶] ... [¶] |
| "[A.Y.]: | What do I say if ... |
| "[DEFENDANT]: | You told her something? |
| "[A.Y]: | No I didn't tell her anything. It's just I'm afraid that I am pregnant 'cause I'm late. I haven't had my period and I'm afraid that she ... |
| "[DEFENDANT]: | Yeah. That is way way – I don't know …. What are you gonna say? |
| "[A.Y.]: | Isn't it possible that I'm pregnant? |
| "[DEFENDANT]: | Uh, what, so. You know what I'm saying? You gonna talk to me like that then, uh, I don't know what to say. I don't know what you makin' up. I don't know. I don't know. [¶] … [¶] |

9.

"[A.Y.]:                Well isn't it possible ...

"[DEFENDANT]:          Well, it, uh, why you think she's gonna ask you if we had sex?  Why?  [¶] ... [¶]

"[A.Y.]:                Well it's because when we had sex you didn't use a condom and I'm afraid th ...

"[DEFENDANT]:          Yeah, I don't – we ha-I – okay.  Okay.  Well wh-who – what do you want?  What you planning?  [¶] … [¶]

"[A.Y.]:                I need your help in case if I am.

"[DEFENDANT]:          Okay.  You – somebody's with you?

"[A.Y.]:                No.

"[DEFENDANT]:          What you – I don't know.  I ca-I don't know why.  I don't know if I trust you.  Why – what you been saying.  I don't know what's going on.  'Cause I'm not – I'm not.  Hold on.  Which day is it?  Hold on.  What's going on?  What you tell th-th-there?  Over there?  Why did I just, uh, weird right now or (unintelligible) [A.Y.'s mother] I – I don't ... [¶] ... [¶]

"[DEFENDANT]:          What you told [your mother]?

"[A.Y.]:                What?

"[DEFENDANT]:          What you told [your mother]?  Be – be honest. Because I don't know an – I wanna – did she say it's mine?  Did she send me a text?  All right.  She's, uh, having the, uh, [¶] ... [¶]

"[A.Y.]:                Wait.  Hold on.  But what do I tell (D[]) and (C[]) if they make me take a pregnancy test?  [¶] ... [¶]

[A.Y.]:                But I've only done it with you and you know that?

"[DEFENDANT]:          No. No. Yeah but I said the neighbors man was – um, neighbor.  I forgot – is (M[])'s new mom?  (M[])'s mom like three months.  And you have your – your thing."

10.

*Defense Case-in-Chief*

Defendant testified on his behalf and denied all allegations made against him. Specifically, defendant testified A.Y. was lying because she was "angry" and "wasn't happy" with having her phone and tablet confiscated in Louisiana. Further, defendant acknowledged he received the pretext phone call from A.Y. and testified to its accuracy.

**DISCUSSION**

I.    PROSECUTORIAL MISCONDUCT CLAIMS

Defendant makes several prosecutorial misconduct claims.[10] Defendant contends the prosecutor committed prejudicial misconduct when he: (1) improperly shifted the burden of proof during defendant's cross-examination by insinuating defendant had no cooperating witnesses and a duty to produce this evidence, and then argued this lack of corroboration during his closing arguments; (2) referenced sexual abuse against A.Y.'s aunt before the trial court had made its ruling as to its admissibility; and (3) questioned defendant regarding his statements made after his Louisiana arrest even though it had not been established the statements were not obtained in violation of his *Miranda* rights. As to each individual claim, we conclude the conduct does not rise to the level of prosecutorial misconduct.

A.    *Applicable Law*

Prosecutorial misconduct exists " 'under state law only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Earp* (1999) 20 Cal.4th 826, 858.) In more extreme cases, a

---

**10**    Apart from his prosecutorial misconduct claims, defendant further contends the prosecutor failed to comply with his discovery obligations pursuant to both *Brady v. Maryland* (1963) 373 U.S. 83 and section 1054.1, regarding any police reports generated as a result of his Louisiana arrest. However, trial counsel stated he possessed a Louisiana arrest report and asked the prosecutor, "Are you in possession of anything in excess of that?" and the prosecutor replied, "No." Because the record is silent as to whether any other reports existed, apart from the arrest report turned over to trial counsel, we presume the prosecutor complied with his discovery obligations.

defendant's federal due process rights are violated when a prosecutor's improper remark(s) " ' " 'infect[s] the trial with unfairness' " ' " making it fundamentally unfair. (*Ibid.*)  For example, it is prosecutorial misconduct to both misstate the law (*People v. Cortez* (2016) 63 Cal.4th 101, 130), and to misstate the evidence or go beyond the record. (*People v. Gonzalez* (2011) 51 Cal.4th 894, 947; *People v. Davis* (2005) 36 Cal.4th 510, 550-551.)

"A defendant asserting prosecutorial misconduct must … establish a reasonable likelihood the jury construed the remarks in an objectionable fashion." (*People v. Duff* (2014) 58 Cal.4th 527, 568.)  "To preserve a claim of prosecutorial misconduct on appeal, ' "a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.  [Citations.]" [Citation.] The failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would have not cured the harm.' " (*People v. Fayed* (2020) 9 Cal.5th 147, 204 (*Fayed*).)

B.      *Analysis*

       *1.  Burden Shifting Claim*

Defendant argues the prosecutor committed misconduct when he improperly shifted the burden of proof during both defendant's cross-examination and his closing arguments.  During the cross-examination, the following relevant exchange occurred:

> "[PROSECUTOR]:      So during this entire time that this case was getting ready for trial, you couldn't find any evidence or witnesses to corroborate –
>
> "[TRIAL COUNSEL]:      Objection.  Burden Shifting.
>
> "[TRIAL COURT]:      Sustained.
>
> "[TRIAL COUNSEL]:      Motion to strike.  I'd like an admonition to the jury.
>
> "[TRIAL COURT]:      So I didn't hear a response, so there's nothing to strike.

12.

"[TRIAL COUNSEL]:  Thank you, Your Honor.

"[TRIAL COURT]:  Proceed, Counsel."

During the prosecutor's closing argument, he argued that defendant "gave a bunch of self-serving statements that were uncorroborated."

Here, trial counsel objected to the prosecutor's question during cross-examination and subsequently " ' "ask[ed] the trial court to admonish the jury to disregard the impropriety." ' " (*Fayed*, *supra*, 9 Cal.5th at p. 204.)  Because trial counsel did object and requested an admonition from the trial court, defendant's prosecutorial misconduct claim is preserved on appeal.  However, during the prosecutor's closing arguments, trial counsel did not object to this statement and thus, this specific claim of prosecutorial misconduct is forfeited.  (*Ibid.*)

As to defendant's cross-examination, although his prosecutorial misconduct claim is preserved on appeal, the claim still fails.  Here, the prosecutor's question does not rise to the level of reversible prosecutorial misconduct.  Trial counsel objected to the question, the question was then sustained, defendant did not answer the question, and the prosecutor moved on to another subject.  "A party generally is not prejudiced by a question to which an objection has been sustained."  (*People v. Johnson* (2003) 109 Cal.App.4th 1230, 1236; *People v. Edwards* (2013) 57 Cal.4th 658, 735 ["Under these circumstances, even assuming the prosecutor committed misconduct by asking the question, no prejudice was possible under any standard."]; *People v. Dykes* (2009) 46 Cal.4th 731, 764 [holding that "because the trial court sustained objections to the argumentative element of the prosecutor's questioning, we assume any prejudice was abated"].)

Additionally, as to the misconduct claim relating to the prosecutor's closing arguments, assuming the claim is preserved, this claim also fails.[11] The statement that defendant "gave a bunch of self-serving statements that were uncorroborated" did not amount to prosecutorial misconduct. " ' "[A] prosecutor is given wide latitude to vigorously argue his … case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence." ' " (*People v. Peoples* (2016) 62 Cal.4th 718, 796.) As our Supreme Court has repeatedly stated, " '[A] distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and . . . an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' " (*People v. Steskal* (2021) 11 Cal.5th 332, 352, quoting *People v. Bradford* (1997) 15 Cal.4th 1229, 1340.)

For example, in *People v. Redd* (2010) 48 Cal.4th 691, the prosecutor repeatedly challenged the basis for the defense theory and remarked, " 'I have a blank paper because I'm not sure exactly what the defense is yet. I'm going to sit here like you and listen to [defense counsel]. I don't know what he's going to say.' " (*Id.* at p. 739.) Later, the prosecutor jibed he was " 'waiting to hear what the defense was.' " (*Ibid.*) Our Supreme Court rejected the notion these remarks shifted the burden of proof to the defendant because "the prosecutor's comments merely highlighted his observation that there seemed to be no coherent defense to the charges," (*id.* at p. 740) which, although the court did not explicitly say, was a permissible comment on the state of the evidence.

---

**11** Defendant further contends it was misconduct for the prosecutor to "misstate the law" during his closing argument. However, as we discuss further below, even if the prosecutor misstated the law, which we are not saying is the case, the jury was properly instructed that "[n]othing that the attorneys say is evidence" and to only consider the evidence.

14.

Here, although defendant argues the prosecutor's statement amounted to an implication that defendant "had a duty" to produce evidence and thus, improperly shifted the burden of proof to him, this argument is not supported by the law. The prosecutor was permitted to comment on the fact that "defendant ha[d] not produced any evidence" and was in no way insinuating that defendant had "a duty or burden to produce evidence, or a duty or burden to prove his …. innocence." (*People v. Steskal*, *supra*, 11 Cal.5th at p. 352.) Rather, as our Supreme Court noted, all the prosecutor was doing was "merely highlight[ing] his observation that there seemed to be no coherent defense to the charges," which he was allowed to do. (*People v. Redd*, *supra*, 48 Cal.4th at p. 740; see also *People v. Hill* (1998) 17 Cal.4th 800, 819 [" 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " ' "].) Accordingly, even assuming defendant's misconduct claim is preserved, the prosecutor's statement during his closing arguments did not amount to prosecutorial misconduct.

*2. A.Y.'s Aunt's Testimony*

Defendant further argues the prosecutor committed misconduct when he referred to inadmissible evidence during his opening statement. In the prosecutor's motions in limine, he moved to introduce testimony by A.Y.'s aunt regarding an "incident of sexual abuse she suffered at the hands of [] defendant when she was approximately 14 years old." Before the trial commenced, the trial court stated it was "inclined to grant that motion, but it may require further hearing by the Court." The admissibility of the testimony was still undecided at the time of opening statements. Thereafter, the prosecutor stated the following during his opening statement:

> "Now, also, you're going to hear from – maybe you're going to hear from [A.Y.'s] aunt, a person by the name of …. She's going to talk about how [] defendant acted inappropriately to her when she was about [A.Y.'s] age, at 14 and 15 years of age. Now, what she claims happened is nowhere near what [A.Y.] went through; in fact, it's very mild. She basically is going to talk about lingering hugs that went too long and how he would caress her back. And she's going to talk about a specific incident where []

15.

defendant took her out driving one time and kind of in a suggestive way rubbed her hand while her hand was on the gear shift. And those incidents, taken by themselves, are not going to be really all that probative of anything, but when you hear the evidence at trial, it's going to be corroboration as to what [A.Y.] is going to testify to, especially in light of the fact that the evidence will show that [A.Y.'s aunt] made these accusations to family members years before any allegations or any of the abuse of [A.Y.] even came to light."

Trial counsel did not object to the statement.

During A.Y.'s cross-examination, the trial court, outside the presence of the jury, raised issue regarding the prosecutor's remarks during his opening statement. Specifically, the trial court stated the following:

"All right. So the Court is a little bit concerned about one issue. I'll address it with Counsel. We can talk about it after lunch. My recollection was we were going to have a [Evidence Code section] 352 hearing before the [Evidence Code section] 1108 evidence regarding – I forgot if it's the niece or the cousin or the sister was to be admitted, but, Counsel, you mentioned that in your opening statement and determination hasn't been made as to whether or not that's admissible in this case, so I just want to point that out to everyone. In fact, it may not be and we need to schedule a hearing to make that determination – a [Evidence Code section] 402 hearing – to make that determination before that evidence is presented. So I'll just throw that out there, and perhaps we can address it for a moment or two at the – when we come back at 1:30."

After lunch, the trial court heard arguments regarding the opening statement issue. Trial counsel argued it prejudiced defendant's case and moved for a mistrial. The trial court ruled the motion was premature "because the evidence may come in" and "den[ied] [the] motion for a mistrial at this time."

Subsequently, after Detective Keiser's testimony concluded, the trial court conducted an Evidence Code section 402 hearing regarding the admissibility of A.Y.'s aunt's testimony. The trial court, after hearing testimony from A.Y.'s aunt, denied the prosecutor's request to admit this evidence concluding that "[t]he evidence does not provide one of a sexual nature crime, or if it does, it is so minimally probative as to be

16.

outweighed by a prejudicial effect." Thereafter, the following relevant exchange occurred between the trial court, the prosecutor, and trial counsel:

"[TRIAL COURT]: All right. So there was one other thing that Counsel raised, the issue of the fact that the People brought up this evidence in their opening statements and Counsel is asking for a mistrial. I'll be happy to hear arguments on that.

"[TRIAL COUNSEL]: Your Honor, [the prosecutor] raised the issue in opening statement prior to having a [Evidence Code section] 402 hearing. The evidence has been excluded. However, you can't unring the bell. While I can say that the People said that – that he framed it in such a way that you may or may not hear from her, so there my argument has been neutralized by the way he framed the introduction – the potential introduction, you may hear this, so the jury has already heard that, you know, [defendant] had done these things. And he used the report of the same nature to the aunt. I can't see how the jury doesn't have that in mind and that I can effectively neutralize it.

"Now, can the Court give a curative admonition? One could be crafted, I suppose. I don't know if it would completely take away the prejudicial effect and render this an unfair trial for my client. It's a hard – it's a hard problem that we're facing right now. And I renew my motion for the mistrial. I believe that even the best curative would be insufficient to override the effects – the prejudicial effects of this impropriety.

"And on that, I'll submit.

"[TRIAL COURT]: And, [prosecutor].

"[PROSECUTOR]: As [trial] [c]ounsel knows, an opening statement is not evidence; in fact, they're admonished that you're not supposed to use an opening statement as evidence. And simply all I did was convey to the jury what I believed the evidence would be at trial. There was nothing prohibiting me from offering that as possible evidence. We didn't have a [Evidence Code section] 402 [hearing] scheduled.

"[TRIAL COUNSEL]: We did.

"[PROSECUTOR]: I don't recall there being a [Evidence Code section] 402 [hearing] scheduled. As I remember we left it, is that when I recited what I believed her testimony would be – and I believe you asked me kind of briefly to go over what I felt her testimony would be – you said,

17.

'Well, we may do a hearing on this later.'  But when we started the trial, there was nothing said, and there was nothing precluding me from actually mentioning that in an opening statement.

"[TRIAL COURT]:    All right.  So I'm going to deny your motion for a mistrial.

"[TRIAL COUNSEL]:    Thank you, Your Honor.

"[TRIAL COURT]:    Again, it was an opening statement; it was not evidence.  The jury has been informed that Counsel's statements are not evidence.  They have been informed that they're to render a decision based upon the evidence that's presented from the witness stand or any documents that are admitted.  And when the Court further instructs, some of those things will be reiterated.  I don't think there's anything – any juror that could believe that what Counsel said in opening statement is evidence and would rely on that.  Plus the Defense has an opportunity to point out that there was no evidence presented contrary to the opening statement and make it clear to the jury that that is the case, so I don't see a need for a mistrial.  I don't see any prejudice in this matter, so I'll deny that."

Here, trial counsel failed to object to the alleged instance of prosecutorial misconduct during the prosecutor's opening statement and fails to offer any persuasive reason to excuse this forfeiture.  "The remark was made at the very beginning of the trial, and there is no reason to suspect that corrective action would have been futile."  (*People v. Flores* (2020) 9 Cal.5th 371, 403 (*Flores*); cf. *People v. Friend* (2009) 47 Cal.4th 1, 29 [failure to object excused "when the 'misconduct [is] pervasive, ... and the courtroom atmosphere was so poisonous that further objections would have been futile' "].)

In any event, regardless of whether defendant forfeited the asserted error, the prosecutor's actions did not amount to prejudicial misconduct.  "The purpose of the opening statement is to inform the jury of the evidence the prosecution intends to present, and the manner in which the evidence and reasonable inferences relate to the prosecution's theory of the case."  (*People v. Millwee* (1998) 18 Cal.4th 96, 137.)  " ' "[R]emarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor 'was "so patently inadmissible as to charge the

18.

prosecutor with knowledge that it could never be admitted." ' " ' " (*Flores*, *supra*, 9 Cal.5th at p. 404.)

For example, in *Flores*, the prosecutor during her opening statement "said [the] defendant 'admits to having the 9 mm. He also admits to taking down his rifle. That he had all of those. Went to Mexico with him.' " (*Flores*, *supra*, 9 Cal.5th at p. 404.) Later on, the defendant's admission that he took the nine-millimeter handgun to Mexico "was not directly supported by the evidence[.]" (*Ibid.*) Our Supreme Court concluded that although "the prosecutor mischaracterized [the] defendant's admission regarding the transportation of the nine-millimeter handgun in her opening statement[,] … we cannot say the prosecutor's characterization of what she expected the evidence to show was wholly unsupported[,]" and thus, these remarks did not rise to prosecutorial misconduct. (*Id.* at pp. 405–406.)

Similarly, here, the prosecutor requested that A.Y.'s aunt's testimony be admitted in his case-in-chief pursuant to Evidence Code section 1108. However, prior to opening statements, the issue regarding its admissibility remained undecided. Therefore, the prosecutor's remarks during his opening statement were proper because they were fairly based on "the evidence the prosecut[or] *intend[ed]* to present" (*People v. Millwee*, *supra*, 18 Cal.4th at p. 137, italics added), and therefore, "we cannot say the prosecutor's characterization of what []he expected the evidence to show was wholly unsupported." (*Flores*, *supra*, 9 Cal.5th at p. 405.)

In any event, any mischaracterization by the prosecutor was not prejudicial. " '[P]rosecutorial misconduct in an opening statement is not grounds for reversal of the judgment on appeal unless the misconduct was prejudicial or the conduct of the prosecutor so egregious as to deny the defendant a fair trial.' " (*People v. Wrest* (1992) 3 Cal.4th 1088, 1109.) Here, the trial court twice instructed the jury the attorneys' remarks during their opening statements did not constitute evidence. (*People v. Pearson* (2013) 56 Cal.4th 393, 414 (*Pearson*) ["We presume that jurors understand and follow the

19.

court's instructions."].)  Further, defendant had a full opportunity "to challenge and rebut all evidence offered against him[,]" which is exactly what he did in this case.  (*People v. Wrest*, at pp. 1109–1110.)  Trial counsel during his closing argument stated the totality of the case relied on circumstantial evidence and argued:

> "There should be, given the amount of sexual activity that took place, some form of corroboration.  There is no independent corroboration.  No mother, no brother, *and no aunt that you were promised corroborating what this girl said*.  She stands alone, sadly."  (Italics added.)

In light of the trial court's instructions, coupled with defendant's challenge of the very evidence the prosecutor misstated, we discern no prejudice or denial of defendant's right to a fair trial.

### 3. Post-Arrest Statements

Defendant further argues the prosecutor committed misconduct when he questioned him regarding his Louisiana arrest.[12]  The following exchange occurred during defendant's cross-examination:

> "[PROSECUTOR]:    Now, when you got arrested for these crimes, you got arrested in Louisiana, correct?
>
> "[DEFENDANT]:    That's correct.
>
> "[PROSECUTOR]:    And do you recall actually talking to law enforcement in Louisiana about this incident?
>
> "[TRIAL COUNSEL]:    May we approach?
>
> "[DEFENDANT]:    That's correct.
>
> "[TRIAL COURT]:    Yes, you may approach?

---

[12]    Defendant further contended in his opening brief the prosecutor committed misconduct by mentioning facts surrounding his Louisiana arrest in his closing arguments.  However, defendant conceded in his reply brief the prosecutor never mentioned the arrest during his closing arguments and thus, we do not address this additional claim in this appeal.

"(Bench conference held)

"[TRIAL COUNSEL]:    I don't know of any reports from law enforcement.

"[TRIAL COURT]:    All right.

"[TRIAL COUNSEL]:    I don't know of any reports of his interview with law enforcement in Louisiana.

"That's true, but not the reports, just the one line and our report.

"Are you in possession of anything in excess of that?

"[PROSECUTOR]:    No.

"[TRIAL COUNSEL]:    Okay.  I'll accept his representation.

"[TRIAL COURT]:    All right.

"(Bench conference concluded.)

"[TRIAL COURT]:    Proceed.

"[PROSECUTOR]:    Thank you.

"[PROSECUTOR]:    Do you recall talking to Detective Milo?

"[DEFENDANT]:    I don't recall his name.  It's been more than four years.  I don't recall his name.

"[PROSECUTOR]:    It's hard to remember stuff four years ago?

"[DEFENDANT]:    Specific names, yes.  Especially if it's just passersby, you don't remember.

"[PROSECUTOR]:    Now, he asked you about that recording, the pretextual phone call that Sergeant Keiser made to you – or excuse me, that [A.Y.] made to you, correct?

"[DEFENDANT]:    Yes, yes, that's correct.

"[PROSECUTOR]:    And when he asked you about it, do you recall what you told him?

"[DEFENDANT]:    I don't recall.  It's precisely what I just told you.  I was busy.  My mind was everywhere.

21.

"[PROSECUTOR]:     Well, I'm not talking about the pretextual call.  What I'm asking is: Do you remember when Detective Milo in Louisiana asked you about the pretext phone call?  Do you recall what you told him?

"[DEFENDANT]:     Yes.  I told him I had had a call with her.

"[PROSECUTOR]:     Do you recall saying anything else?

"[DEFENDANT]:     I don't recall exactly the words that I used at that moment.

"[PROSECUTOR]:     Would it refresh your memory if you were to see something written from a report talking about what you told Detective Milo?

"[DEFENDANT]:     Probably. [¶] ... [¶]

"[PROSECUTOR]:     Do you read and understand English?

"[DEFENDANT]:     A little.

"[PROSECUTOR]:     Can you read the highlighted section?

"[DEFENDANT]:     The interview that they conducted was done in English.  At that moment, I didn't understand English as I do now.

"[PROSECUTOR]:     Well, did you understand what you read there?

"[DEFENDANT]:     Yes, but I never testified to that.

"[PROSECUTOR]:     Well, I'm just asking: Did you understand the highlighted section I had you read?

"[DEFENDANT]:     Yes, I understood – I understand it now.

"[PROSECUTOR]:     Okay.  The underlined section, did you say that to Detective Milo when asked about the pretextual phone call?

"[DEFENDANT]:     I never told him in those words.  I never told him that.

"[PROSECUTOR]:     Well, what did you tell him?

"[DEFENDANT]:    I didn't know anything that – I didn't know what he was speaking of.

"[PROSECUTOR]:    Did you say that underlined section?

"[DEFENDANT]:    I didn't say it, sir."

Subsequently, the following exchange occurred on redirect examination:

"[TRIAL COUNSEL]:    Now you just read the paragraph that [the prosecutor] showed you?

"[DEFENDANT]:    Yes.

"[TRIAL COUNSEL]:    Did it contain any quotes?

"[DEFENDANT]:    I don't understand your question.

"[TRIAL COUNSEL]:    Did they quote you?

"[DEFENDANT]:    No, I didn't say that highlighted portion.

"[TRIAL COUNSEL]:    And that was just a summary of what the officer or detective in Louisiana wrote down about what you had told him?

"[DEFENDANT]:    That's correct. I could assume that that was the case.

"[TRIAL COUNSEL]:    But it wasn't a quote?

"[DEFENDANT]:    It wasn't.

"[TRIAL COUNSEL]:    Now, did they speak English to you, or did they speak Spanish to you in Louisiana?

"[DEFENDANT]:    At all times I never had an interpreter as I do today.

"[TRIAL COUNSEL]:    Did they provide you your *Miranda* [italics added] rights?

"[DEFENDANT]:    I didn't understand. It wasn't until later the detective handed me a paper and said sign here, and I didn't understand.

"[TRIAL COUNSEL]:    And was that paper in Spanish, sir?

"[DEFENDANT]:    No, it wasn't, sir.

23.

"[TRIAL COUNSEL]:    Did you have a lawyer present?

"[DEFENDANT]:    At that moment, no.

"[TRIAL COUNSEL]:    Your honor, I'd move to strike that entire line of questioning by [the prosecutor].

"[TRIAL COURT]:    Overruled."

After the prosecutor's closing arguments, trial counsel raised issue with the prosecutor's line of questioning regarding defendant's Louisiana arrest.

Here, it is unclear a *Miranda* advisement was required because the issue regarding the admissibility of defendant's alleged statements to Detective Milo was not litigated below.[13]  Regardless, the only statement admitted during defendant's cross-examination was defendant's acknowledgment he had a phone call with A.Y., which he had already admitted during his direct examination.  Therefore, defendant's prosecutorial misconduct claim fails because any prejudice deduced from this single statement was dispelled by defendant's own admission regarding the pretext phone call.[14]

II.    THE JURY WAS PROPERLY INSTRUCTED

Apart from the prosecutorial misconduct claims, defendant also contends the trial court erred by failing to properly instruct the jury.  Specifically, defendant argues the jury was improperly instructed regarding (1) the sustained objection during his cross-examination and (2) the Evidence Code section 1108 conduct, specifically, the alleged

---

**13**    However, even it was found that a *Miranda* violation had occurred, defendant's statements to Detective Milo may have been admissible for impeachment purposes. (*Oregon v. Hass* (1975) 420 U.S. 714, 723–724 [a statement taken after the police fail to honor the suspect's invocation of the right to counsel during interrogation is admissible for impeachment purposes]; *People v. Hoyt* (2020) 8 Cal.5th 892, 936 [statement taken in violation of *Miranda* is otherwise admissible to impeach the defendant's credibility as a witness].)

**14**    Because we conclude defendant's prosecutorial misconduct claim fails, we do not address whether the trial court erred in permitting this statement to be admitted during the trial.

abuse against A.Y.'s aunt mentioned by the prosecutor during his opening statement and the uncharged conduct in both Texas and Louisiana. We disagree.

Here, as we previously stated, "We presume that jurors understand and follow the court's [entire] instructions." (*Pearson*, *supra*, 56 Cal.4th at p. 414; *People v. Dieguez* (2001) 89 Cal.App.4th 266, 277 ["There is no error in a trial court's failing or refusing to instruct on one matter, unless the remaining instructions, considered as a whole, fail to cover the material issues raised at trial."].) The trial court instructed the jury before and after the presentation of evidence that, "[n]othing that the attorneys say is evidence" and that "[t]heir questions are not evidence. Only the witnesses' answers are evidence." Further, the jury was instructed to "not assume that something is true just because one of the attorneys asked a question that suggested it was true" and if the trial court "sustain[s] an objection, the witness will not be permitted to answer and you must ignore the question[,]" and "[i]f the witness does not answer, do not guess what the answer might have been or why [the court] ruled as [it] did." Additionally, as to the uncharged conduct in Texas and Louisiana, the trial court instructed the jury that "[i]f you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence" and that "[t]he People must still prove each charge and allegation beyond a reasonable doubt." Lastly, and most importantly, the jury was told "[a] defendant in a criminal case is presumed to be innocent" and that the People had the burden to prove the case beyond a reasonable doubt. Accordingly, even assuming the trial court erred in failing to properly instruct the jury regarding the sustained objection and the Evidence Code section 1108 evidence, defendant was not prejudiced by *any* of the alleged errors.

III.    THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING DEFENDANT'S TWO SEPARATE MOTIONS FOR A MISTRIAL.

Defendant further contends the trial court erred in denying his two separate motions for a mistrial. We again disagree.

25.

*A.* *Applicable Law*

The denial of a motion for a mistrial is generally reviewed for abuse of discretion. (*People v. Avila* (2006) 38 Cal.4th 491, 573.) " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Collins* (2010) 49 Cal.4th 175, 198.) "As the moving parties, appellants bore the burden of proof to demonstrate this." (*People v. Garcia* (2022) 83 Cal.App.5th 240, 248.)

*B.* *Analysis*

As noted above, trial counsel made a motion for a mistrial based on the prosecutor mentioning the alleged acts against A.Y's aunt in his opening statement; the trial court then denied the motion. Subsequently, after the prosecutor's closing arguments, trial counsel made a second motion for a mistrial based on the prosecutor's line of questioning regarding defendant's Louisiana arrest. Specifically, trial counsel stated the following:

> "Your Honor, [the prosecutor], during his cross-examination, brought up the fact that my client was arrested. Once again, I'm going to renew my motion for a mistrial; that is highly prejudicial and inappropriate."

The trial court denied the motion for mistrial because it did not "believe there's been any testimony regarding *Miranda*, et cetera." (Italics added.)

Here, because a mistrial motion "requires a nuanced, fact-based analysis[,]" which is best performed by the trial court (*People v. Chatman* (2006) 38 Cal.4th 344, 370), and we have already concluded the prosecutor's comments during his opening statement and his cross-examination did not constitute prosecutorial misconduct, we further conclude

26.

the trial court did not abuse its discretion in denying trial counsel's two separate motions for a mistrial.

Accordingly, reversal of the trial court's orders denying defendant's two separate motions for a mistrial is not required.

IV.    CUMULATIVE PREJUDICE

Finally, defendant contends he was prejudiced by the cumulative effect of the alleged errors.  However, we have concluded the prosecutor did not engage in misconduct, nor did the trial court err.  Accordingly, there is no cumulative effect to weigh.  (*In re Reno* (2012) 55 Cal.4th 428, 483 [holding that each of defendant's individual claims "cannot logically be used to support a cumulative error claim [where] we have already found there was no error to cumulate"].)  Furthermore, "[t]o the extent there are a few instances in which we have found error or assumed its existence, no prejudice resulted.  The same conclusion is appropriate after considering their cumulative effect." (*People v. Valdez* (2012) 55 Cal.4th 82, 181.)

**DISPOSITION**

For the foregoing reasons, the judgment is affirmed.


FRANSON, Acting P. J.

WE CONCUR:


PEÑA, J.


MEEHAN, J.

27.